579 A.2d 1288

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Joseph OGLIALORO, Appellee.**

Supreme Court of Pennsylvania.

Argued Dec. 14, 1989.

Decided Aug. 23, 1990.

Reargument Denied Oct. 30, 1990.

Alan M. Rubenstein, Dist. Atty., T. Gary Gambardella, Asst. Dist. Atty., Stephen B. Harris, Chief, Appeals Div., for appellant.

Claire C. Capristo, for amicus—Pa. D.A. Assn.

Ernest D. Preate, Jr., for amicus—Office of Atty. Gen.

Ronald H. Elgart, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This is an appeal of the Commonwealth of Pennsylvania, Appellant, from the opinion and order of the Superior Court granting the Appellee, Joseph Oglialoro, a new trial and reversing the order of the Court of Common Pleas of Bucks County.

On September 9, 1986, the Honorable Edward G. Biester, Jr., denied the Appellee's motion to suppress marijuana seized from his premises. Appellee was later convicted, in a non-jury trial before Judge Biester, of possession of a controlled substance, possession with intent to deliver, and possession of drug paraphernalia, and sentenced to a term of imprisonment of 11½ to 23 months. This conviction stemmed from the following incident, as summarized by the suppression court:

> On October 11, 1985, Pennsylvania State Police at the Trevose Barracks received an anonymous telephone tip, allegedly from a private aircraft pilot reporting the presence of marijuana in the [Appellee's] pole-barn. (N.T., p. 15). Acting on the tip, three police officers flew over the premises in a state police helicopter on October 16, 1985. (N.T., pp. 15, 33). The day was bright and sunny. (N.T., p. 40). The helicopter initially flew over [Appellee's] property at a height of approximately 500 feet above the [Appellee's] barn; however, the police were unable to

ascertain the barn's contents at that altitude and therefore reduced their altitude to approximately 50 feet over the barn. (N.T., pp. 23–24). The police were not using any visual aids to assist their observations. (N.T., pp. 33, 47). While hovering at 50 feet, police observed the tops of plants which were pressed up against the barn's roof, and which clearly matched the color, size, and configuration of marijuana. (N.T., pp. 56–57). The police helicopter hovered at a height of 50 feet for approximately 15 seconds and made a total of three or more passes over the [Appellee's] property, lasting approximately five minutes. (N.T., pp. 25, 32, 45,). [Appellee's] wife was present in the home at the time. (N.T., p. 93). She experienced various sensations caused by the helicopters proximity, such as loud noise, and vibration of the house and windows. (Id.)

After clearly identifying the marijuana from an altitude of 50 feet over the barn (N.T., pp. 63–64), the helicopter returned to the State Police Barracks. On the basis of the officers' aerial observations, the local police chief proceeded to obtain a search warrant (N.T., pp. 25–26), while other officers drove to the site to secure the property in the interim. (N.T., p. 26).

The officers participating in the aerial viewing had significant training and experience in the detection of marijuana. (N.T., pp. 29–30, 55). Marijuana has a precise growing configuration (N.T., p. 30), and grows in a distinctive color, distinguishable from other vegetation growing in Pennsylvania. (N.T., pp. 47–48, 58–60). From an altitude of 500 feet it was possible to observe through the barn roof a color identical to the color of growing marijuana plants. (N.T., p. 39). At 50 feet, it was possible to identify, clearly as marijuana, the leaves of a plant which were pressed against the barn roof. (N.T., p. 39). In general, it was possible to observe objects inside the barn through the roof, especially if the object was positioned close to the roof. (N.T., p. 39).

When the search warrant arrived, the police forcibly entered the barn and observed 91 very large marijuana plants. (N.T., p. 9, Exhibits CS–3, 13). The plants appear to have ranged in height between 12 to 18 feet tall, and some were stooped over and pressed against the barn's roof. (Exhibits CS–3, 13).

Appellee appealed to the Superior Court. *Commonwealth v. Oglialoro*, 377 Pa.Superior Ct. 317, 547 A.2d 387 (1988). In that appeal, Appellee contended that the police conducted an illegal helicopter search because it interfered with his reasonable expectation of privacy in his pole-barn. Furthermore, Appellee insisted his pre-trial motion to suppress should have been granted, and that fruits of the illegal search, the marijuana plants, should have been suppressed.

The Superior Court agreed and held that the marijuana was suppressible. Accordingly, the Superior Court reversed the judgment of sentence and granted Appellee a new trial. In so doing, that Court found persuasive the holding in the case of *People v. Sabo*, 185 Cal.App.3d 845, 230 Cal.Rptr. 170 (1986), *cert. denied, California v. Sabo*, 481 U.S. 1058, 107 S.Ct. 2200, 95 L.Ed.2d 855 (1987). In *Sabo*, the California Court of Appeals concluded that helicopter "views from non-navigable airspace of a defendant's marijuana viewed through the missing panels of a greenhouse, located in the defendant's backyard, constituted an invasion of privacy, and the seizure of contraband under the warrant issued pursuant to the helicopter viewing violated respondents Fourth Amendment rights." *Sabo*, 230 Cal. Rptr. at 176.

We granted the Commonwealth's petition for allowance of appeal to consider the propriety of the Superior Court's conclusion that suppressing the evidence obtained here was part of an illegal search.

To prevail successfully on a claim of governmental invasion of privacy, Appellee is required first to show that a subjective expectation of privacy exists as to the area being

searched. An expectation of privacy is present when the individual, by his conduct, "exhibits an actual (subjective) expectation of privacy" and that the subjective expectation "is one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967).[1] See, *Commonwealth ex rel. Cabey v. Rundle,* 432 Pa. 466, 470, 248 A.2d 197 (1968); *Commonwealth v. Brachbill,* 520 Pa. 533, 555 A.2d 82 (1989). The controlling consideration is whether the individual contesting the search and seizure entertains a legitimate expectation of privacy in the premises or area searched. See, *Commonwealth v. Dobson,* 486 Pa. 299, 317–18, 405 A.2d 910, 920 (1979).

Appellee contends that he exhibited an expectation of privacy in the pole-barn because of the manner of its construction and its location in a rural area. This structure stood approximately 18 feet tall. The sides of the barn were completely opaque and the roof consisted of *transparent* plastic sheets. He assembled his pole-barn entirely upon his property: approximately 446 feet from the road, and 251 feet from his residence. The building and placement of this structure appear to be such that Appellee successfully denied anyone adjacent to this structure, or parallel to this structure, a view of the goings on inside of it.

However, while this expectation may be adequate to persons attempting to view the contents from ground level, the question is whether Appellee's expectation extended to aerial observations of the roof. Appellee's use of a transparent roof created an unobstructed window to the sky. People in the barn could gaze through the opening skyward and overhead spectators, with equal ease, could peer into the barn because of the transparent roof. Since the construction of the roof made it like an open or uncovered window, it would be most instructive to review the case law

---

1. This formulation appears in Justice Harlan's concurring opinion in *Katz* and was subsequently adopted by the majority. See, *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

as to whether an expectation of privacy is present where one opens his windows.

The mere looking at that which is open to view is not a search. *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Commonwealth v. Milyak,* 508 Pa. 2, 493 A.2d 1346 (1985).

In *Commonwealth v. Hernley,* 216 Pa.Superior Ct. 177, 263 A.2d 904 (1970), *allocatur denied, cert. denied,* 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), a Federal Bureau of Investigation Agent, standing on a ladder and using binoculars, observed gambling records through a window on the third floor of a print shop. The Superior Court accepted the Commonwealth's argument that the defendant left his activities open to view; therefore, there was no violation of the Fourth Amendment. The court stated that "it was incumbent on the suspect to preserve his privacy from visual observation." *Hernley,* 216 Pa.Superior Ct. at 181, 263 A.2d 904.

Failure of a defendant, or those with him, to close the window shades negates defendant's argument that he was deprived of his privacy. *Commonwealth v. Johnson,* 247 Pa.Superior Ct. 208, 372 A.2d 11, 13 (1977), *vacated,* 484 Pa. 349, 399 A.2d 111 (1979).[2] In *Johnson,* the defendant and his accomplice were observed as they left the scene of a robbery. A witness spotted their getaway vehicle in front of an apartment building five blocks from the scene of the crime, and subsequently informed police that he watched three men run into the apartment building. Investigating officers stationed themselves upon a common area patio attached to the rear of the apartment building where they could peer into the apartment through a four inch gap between curtains on a kitchen window. In effect, the *Johnson* court found that the opening in the window negated any expectation of privacy from the eyes of the world or of the police.

**2.** This case was later vacated because the police inadequately advised the defendant of his Constitutional rights, and the statements given by him to the police should have been suppressed.

■ We agree with our Superior Court that there can be no expectation of privacy when one leaves his windows open or uncovered so that any passerby might peer into one's dwelling with impunity, and we have little trouble in concluding that the same result should apply regardless of where the window or opening is placed in the dwelling.

■ By installing a transparent, or at most translucent, roof, Appellee readily allowed exposure of the contents of the structure to the sunlight outside and also knowingly exposed his activities therein to persons lawfully operating aircraft over his property who might decide to take a look. We reject the suggestion that any expectation of privacy attaches in such situations.

■ Nor is our answer different if we consider that the barn was in close proximity to Appellee's home. The trial court specifically found the pole barn was located within the curtilage of Appellee's home. (T.C. Opinion at 8). Curtilage is "the area to which extends the intimate activity associated with the 'sanctity of a man's home and privacies of life.'" *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), and is often afforded a greater privacy protection than an open field because of the traditional significance of the home as a haven from governmental intrusions. This protection, however, is not absolute.

That the area is within the curtilage does not bar all police observation. The Fourth Amendment Protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observation from a public vantage point where he has a right to be and which renders the activities clear and visible. E.g., *United States v. Knotts*, 460 U.S. 276, 282 [103 S.Ct. 1081, 1085, 75 L.Ed.2d 55] (1983). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of a Fourth Amendment Protection." *Katz, supra*, at 351 [88 S.Ct. at 511].

*California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).[3]

■ As long as the police have the right to be where they are, and the activity is clear and visible, the fact they are peering into curtilage is of no significance. Here, there is little question that a transparent roof of a barn presents a clear and visible view of the activities going on in the barn from any height above the barn, and the question becomes whether the police have the right to fly above Appellee's property.

In *Ciraolo,* the United States Supreme Court recognized that police have a right to be present in public navigable airspace and to make non-intrusive observations from aircraft over property, including curtilage, consistent with the strictures of the Fourth Amendment.

The facts in *Ciraolo* reveal that the Santa Clara Police received an anonymous tip that Ciraolo was growing marijuana in his backyard. Police were unable to observe the contents of Ciraolo's backyard because a 6 foot outer fence and a 10 foot inner fence completely enclosed the yard. The investigating officer then secured a private plane and flew over Ciraolo's house at an altitude of 1,000 feet—within "navigable airspace".[4] A search warrant was issued on the basis of an affidavit describing the anonymous tip and the officer's observations [from the air].... *Ciraolo,* 476 U.S. at 209, 106 S.Ct. at 1810, 90 L.Ed.2d at 214.

The Court concluded the fact that the observation took place within the curtilage was not by itself a bar to all police observation. Since any member of the public flying in the airspace above Ciraolo's yard, or a power company repair mechanic on the pole overlooking the yard, who glanced down could have seen everything the officers observed, there was no Fourth Amendment violation. *Ciraolo,* 476 U.S. 214, 215, 106 S.Ct. 1809, 1813, 90 L.Ed.2d 210.

3. The *Knotts* case was later cited in this Commonwealth in the case of *Commonwealth v. Lassiter,* 475 Pa. 582, 321 A.2d 902 (1974).

4. "Navigable airspace" is defined as that altitude above the minimum prescribed by the Civil Aeronautics Board. 49 U.S.C.App. § 1301(29).

Appellee in this case, however, argues, that because the observation was made in "non-navigable airspace", at an altitude of 50 feet above the structure, the observation of his pole-barn amounted to an illegal search and subsequent seizure.

■ Appellee's distinction, accepted by the Superior Court, fails to account for the fact that helicopters are permitted to fly at any altitude if the operation is conducted without hazard to persons or property on the surface. 15 C.F.R. § 91.79 (1988). Since helicopters are permitted to fly at any altitude, all air space is navigable, in the technical sense, and police, like the rest of the public, are permitted to travel in this space.

■ One final question remains. While the police had a right to fly above Appellee's property and he had no reasonable expectation of privacy that they would not peer into his barn, it remains to be decided whether the conduct of the police in flying at 50 feet above the barn was hazardous to persons or property on the surface. If so, the search would be unreasonable and violative of constitutional requirements prohibiting unreasonable searches and seizures. When weighing the issue of whether or not a helicopter surveillance is intrusive to the point of being hazardous, or non-intrusive, a trial court should ask whether or not a risk of harm or danger exists in regards to the person(s) present or property being observed, whether or not a danger, or threat of injury exists, in regards to persons present within the area being searched.

A similar argument was made in the case of *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). Both *Riley* and the case at bar deal with aerial investigations conducted by police authorities after they received anonymous tips that the defendants were cultivating marijuana within the confines of their property. Further, both investigations were conducted from a helicopter which was below the altitude of 500 feet. In *Riley*, a Florida county

sheriff received an anonymous tip that marijuana was being grown on Riley's property.

A plurality of the United States Supreme Court in *Riley* held:

> Nor on the facts before us, does it make a difference for Fourth Amendment purposes that the helicopter was flying at 400 feet when the officer saw what was growing in the greenhouse through the partially open roof and sides of the structure. We would have a different case if the flying altitude had been contrary to law or regulation. But helicopters are not bound by lower limits of the navigable airspace allowed to other aircraft. Any member of the public could legally have been flying over Riley's property in a helicopter at 400 feet and could have observed the greenhouse. The police officer did no more.... there is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude.
>
> _____
>
> While FAA regulations permit fixed wing aircraft to be operated at an altitude of 1,000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other than congested areas, helicopters may be operated at less than the minimums for fixed wing aircraft "if the operation is conducted without hazards to persons or property on the surface. In addition each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the [FAA] administrator." 14 C.F.R. § 91.79 (1988) as cited in *Riley.*

*Riley,* 488 U.S. at 451, 109 S.Ct. at 696, 102 L.Ed.2d at 842.

When the police initially looked into the Appellee's pole-barn, the helicopter was hovering 500 feet above his property, an altitude well within the minimum safe altitudes

prescribed in 14 C.F.R. § 91.79.[5] To further this investigation, they descended to a height of 50 feet over the pole-barn. Helicopters are not bound by the lower limits of the navigable airspace imposed upon other aircraft, and may be operated at less than what the minimums prescribe, ... if the operation is conducted without hazard to persons or property on the surface ... 14 C.F.R. § 91.79(d). Therefore, the police could have observed Appellee's pole-barn from any altitude, unless its operation constituted a hazard to persons or property. While we do not view the FAA regulations as defining the reach of the Fourth Amendment, we certainly see in them a reference designed to insure safety to those in flight and for persons and property on the ground.

At the suppression hearing, the police testified that when they could not make a positive identification of the barn's contents from an altitude of 500 feet, they reduced their altitude to 50 feet, where they hovered over the property for 15 seconds and then made 3 passes over the property over a five minute period. Appellee's wife testified that she was home during this time and that she experienced sensations caused by the helicopter's proximity, including loud noise and vibration of the house and windows.

■■■ We believe that such evidence is sufficient to establish that the helicopter's presence at 50 feet above the barn represented a hazard to persons and property on the ground and that the conduct of the police in flying at this level was unreasonable. We perceive in the testimony of the wife that the surveillance was, in fact, intrusive and that flying the helicopter at this low level created a risk of harm to her and her property during the search. Finally, there is no evidence to rebut the wife's testimony, nor is there testimo-

5. 14 C.F.R. § 91.79 provides, in relevant part:
   Minimum safe altitudes; general. Except when necessary for take-off or landing, no person may operate an aircraft below the following altitudes:
   (d) Helicopters. Helicopters may be operated at less than the minimums prescribed in paragraphs (b) or (c) if the operation is conducted without hazard to persons or property on the surface....

ny from the police to explain that their positive observation could only be made from this dangerously low altitude.

The order of the Superior Court is affirmed.

LARSEN, J., concurs in the result.

McDERMOTT, J., files a dissenting opinion.

McDERMOTT, Justice, dissenting.

The majority, with the faintful solicitude of maiden aunts, would not ruffle the sensibilities of a deliberate, careful, business-like "pot" farmer, because his windows shook when the cops came by helicopter and caught him out. The poor dears were all a-tremble and just about scared out of their conniving wits because a helicopter hovered over their barn 150 yards from the road and 100 yards from their peaceful, rural home where they counted their money and prayed the success of their crop. It may well be that some occasions are a danger larger than the offense sought. Under the facts here, this was not one.

I dissent.