COMMONWEALTH of Pennsylvania

v.

Gregory GINDLESPERGER, Appellant.

Superior Court of Pennsylvania.

Argued June 24, 1997.

Filed Dec. 24, 1997.

CERCONE, President Judge Emeritus:

This is an appeal *nunc pro tunc* [1] from the judgment of sentence entered upon appellant's conviction of possession of marijuana [2] and manufacture of a controlled substance (marijuana).[3] We vacate the judgment of sentence.

We adopt the lower court's statement of the pertinent facts of the case:

Pursuant to a search warrant issued on April 9, 1994, police officers entered the basement area of the defendant's residence and seized approximately 21 marijuana plants. The probable cause for the search warrant was based, in part, on information provided by a confidential informant (hereinafter "CI") that the defendant, Gregory Gindlesperger, was growing marijuana plants in his basement. Further, independent verification of this tip came when the police officer employed a thermal detection device and observed the emanation of heat waste from the defendant's house that was consistent with marijuana production activities.

. . .

According to the affidavit of probable cause for a search warrant, the CI told Officer Gerald Pfadt that he/she observed marijuana plants growing at the defendant's residence during February 1994. The CI stated that the plants were located in the basement and consisted of about 8 adult plants and 30 clone plants. The CI accurately described the appearance of marijuana plants to Officer Pfadt.

Officer Pfadt has been working as a police officer for 9 years, and he has been a member of the Erie County Mobile Drug Task Force for 5 years. He has been involved directly or has assisted in numerous investigations concerning violations of the drug law, including investigations of those who manufacture or grow controlled

Elliot J. Segal, Erie, for appellant.

Garrett A. Taylor, Asst. Dist. Atty., Erie, for Com., appellee.

Before KELLY, J., CERCONE, President Judge Emeritus, and BROSKY, J.

1. Appellant's initial appeal to the Superior Court was dismissed because of the failure of counsel to file a brief. Appellant filed a motion for post-conviction relief on November 12, 1996 in which he requested that the lower court grant him permission to file an appeal *nunc pro tunc*. The lower court granted the PCRA petition and reinstated appellant's direct appeal rights on November 26, 1996. The court gave appellant thirty days in which to file his appeal. Appellant filed a notice of appeal on December 24, 1996.

2. 35 P.S. § 780–113(a)(16).

3. *Id.,* § 780–113(a)(30).

substances, such as marijuana, in indoor environments.

Officer Pfadt asked the CI to confirm marijuana production in the defendant's basement, and during the week of February 13, 1994, the CI did so. In March 1994, the CI told Officer Pfadt that the defendant was now using artificial lights to facilitate marijuana growth.

On March 17, 1994, Captain Gregory Davis of the Pennsylvania Army National Guard Drug Task Force viewed the defendant's residence through a thermal detection device, hereinafter referred to as a "WASP." This device is designed to distinguish appreciable and noticeable amounts of extraneous heat. Captain Davis detected "an unexplainable source of heat coming from the basement area that was not consistent with the location of the furnace or other known heat sources." He also checked five residences of similar structure and design on either side of the defendant's residence and detected no such heat pattern.

On April 9, 1994, a search warrant was issued. Within three days prior to this, the CI again confirmed the production of marijuana plants at the defendant's house. The search warrant was based, in part, on the fact that "[t]his heat source would be consistent with the heat source coming from the artificial lighting used in the growing of marijuana." Officer Pfadt averred that "individuals who grow marijuana in an indoor setting do so in a continuing operation and have plants in various stages of growth so as to be able to have a continuous supply of marijuana to be harvested." He also averred that "the CI has provided information to this officer in the past that has been proven reliable and will result in the arrests of individuals for violations of the drug laws."

During the search of the defendant's residence, the police found marijuana plants growing in the basement and artificial lighting equipment. The defendant was arrested and charged with various violations of the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 708.101 et seq.

Trial court opinion, April 28, 1995, at 1–4 (citations omitted). Appellant filed a pre-trial motion to suppress the evidence seized during the search of his residence. The lower court denied that motion and a bench trial was held on May 30, 1995. On June 2, 1995, the lower court found appellant guilty of the charges. The lower court sentenced appellant, on January 30, 1996, to three to five years imprisonment, one hundred hours of community service, a $15,000 fine, and costs. Appellant's motion to reconsider sentence was denied.

Appellant raises the following issues on appeal:

1. Whether the search warrant based upon information provided by a single and anonymous, first-time confidential informant plus an infrared thermal detection device was unsupported by sufficient and permissible probable cause, thus rendering the ensuing search and seizure of evidence from appellant's home violative of his federal Fourth Amendment and state Article I, section 8 constitutional protections?

2. Whether the Commonwealth's failure to disclose the identity of the confidential informant both before or at the time of the suppression hearing warrants suppression of the evidence and dismissal of the prosecution?

3. Whether the lower court's refusal to accept the appellant's assertion of medical necessity as a legitimate defense at trial and/or sentencing violated his due process and other fundamental constitutional guarantees afforded by amendments 5 and 14 of the United States Constitution and Article I, Sections 1, 2 and 26 of the Pennsylvania Constitution?

4. Whether 35 P.S. § 780–113(a)(30) is unconstitutionally overbroad for failing to differentiate growing/manufacturing small amounts of marijuana for personal/medical use versus large amounts of marijuana for delivery to others?

5. Whether the Commonwealth failed to sufficiently prove the number of live marijuana plants to trigger the three-year mandatory prison sentence of 18 Pa.C.S. § 7508(a)(1)(ii)?

Appellant's brief, at 3.

 Our standard of review of an order denying a suppression motion is as follows:

When reviewing rulings of a suppression court, we must determine whether the record supports that court's factual findings. In so doing, we consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Hughes,* 536 Pa. 355, 366–67, 639 A.2d 763, 769 (1994). When faced with a conflict of testimony, the appellate court defers to the suppression court, which, as fact finder, passes upon the credibility of witnesses, and whose findings are not disturbed when supported by the record. *Commonwealth v. Marshall,* 523 Pa. 556, 568 A.2d 590 (1989).

Appellant's first contention on appeal is that the search warrant herein was not based on sufficient probable cause. Appellant advances three arguments related to this issue: (1) the warrantless use of the WASP device was an unlawful search in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Pennsylvania Constitution; (2) the nature of the WASP device and the way in which it was used rendered the information contained in the probable cause affidavit too unreliable to support a finding of probable cause for a warrant; and (3) the probable cause affidavit failed to establish that the confidential informant and/or his information was credible or reliable, and in fact was based on false or misleading information.

"The standard for evaluating whether probable cause exists for the issuance of a search warrant is the 'totality of the circumstances' test as set forth in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and adopted by [the Pennsylvania Supreme Court] in *Commonwealth v. Gray,* 509 Pa. 476, 484, 503 A.2d 921, 925 (1985)." *Commonwealth v. Jones,* 542 Pa. 418, 424, 668 A.2d 114, 116 (1995). "A magistrate is to make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is

a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 424, 668 A.2d at 116–17 (citations omitted).

The information offered to establish probable cause must be viewed in a common sense, nontechnical manner and deference must be accorded to the issuing magistrate. The duty of a court reviewing the decision is to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Id.* at 424, 668 A.2d at 117 (citations omitted).

■■■ Appellant claims that the warrantless use of the WASP device was an unconstitutional search under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. We will first examine this claim under the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." U.S. Const. amend. IV. "[T]he touchstone of Fourth Amendment analysis has been the question of whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214, 223 (1984), quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587 (1967)(Harlan, J., concurring). An unreasonable search under the Fourth Amendment occurs when (1) a person has exhibited an actual expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable. *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588 (Harlan, J., concurring); *Commonwealth v. Oglialoro,* 525 Pa. 250, 579 A.2d 1288 (1990).

■■ "The Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214, 224 (1984). The courts have extended Fourth Amendment protection to the "curtilage" of the home, "and they have defined the curtilage, as did the common law, by reference to

the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.* at 180, 104 S.Ct. at 1742, 80 L.Ed.2d at 225. "The curtilage area surrounding a private house is entitled to protection under the Fourth Amendment as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept." *Commonwealth v. Lemanski,* 365 Pa.Super. 332, 349, 529 A.2d 1085, 1093 (1987), citing *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). The curtilage "is often afforded a greater privacy protection than an open field because of the traditional significance of the home as a haven from governmental intrusions." *Commonwealth v. Oglialoro,* 525 Pa. at 258, 579 A.2d at 1292.

· In the instant case, the lower court found that the warrantless search of appellant's home with the WASP device was not a search under the Fourth Amendment. The lower court relied on *United States v. Ford,* 34 F.3d 992 (11th Cir.1994) and related cases[4] for the conclusion that a homeowner does not have a reasonable expectation of privacy in "vented heat" or "heat waste." The lower court reasoned that the discharge of heat or other substances, "visible or invisible to the naked eyes, are not so personal and intimate" in detail as to threaten the interests "which form the basis for the need for protection of a residence, namely the intimacy, personal autonomy and privacy associated with a home." Trial court opinion, January 27, 1995, at 7, quoting *United States v. Pinson,* 24 F.3d 1056, 1059 (8th Cir.1994), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994). The lower court relied heavily on its conclusion that the WASP device or thermal imager, does not produce the intimacy of detail that would amount to intrusiveness violative of the Fourth Amendment. Trial court opinion at 11.

The lower court also likened the use of the WASP device to the use by police of surveillance dogs trained to detect the odor of illegal contraband. *Id.* at 8, citing *United*

*States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The court noted that both the "heat waste" theory and the "dog sniff" theory in relation to thermal imagers have been accepted by some courts and rejected by others.

The "heat waste" theory was criticized in *People v. Deutsch,* 44 Cal.App.4th 1224, 52 Cal.Rptr.2d 366 (1996), where the court pointed out that the thermal imager "does not simply measure the waste heat radiating from a structure, but it measures all temperature differentials across the exterior surface of a structure." *Id.* 52 Cal.Rptr.2d at 368. "Therefore, the function of the device is to paint an infrared picture of the heat sources which permits inferences about the heat generating activities occurring within the residence." *Id.* The *Deutsch* court found the decision of the United States Supreme Court in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), more analogous to thermal imaging searches than the "heat waste" theory.

In *Karo,* agents of the Drug Enforcement Administration inserted a beeper in a can of ether and then monitored the movement of the can.[5] At several points during the surveillance, the police were able to determine that the can of ether was located in a private home. At the end of the surveillance, the agents got a search warrant for a house rented by two of the defendants, in which the can of ether containing the beeper was located. The search yielded cocaine and laboratory equipment. The United States Supreme Court found that the monitoring of the beeper while the can was located in a private residence, violated the Fourth Amendment because it "reveal[ed] a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant." *Id.* at 714–15, 104 S.Ct. at 3303, 82 L.Ed.2d at 541–42. Relying on *Karo,* the *Deutsch* court held that the warrantless thermal imaging scan conducted by the police in that case "told the police something about

---

**4.** *E.g., United States v. Pinson,* 24 F.3d 1056 (8th Cir.1994), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994); *United States v. Penny–Feeney,* 773 F.Supp. 220 (D.Hawai'i 1991), *aff'd,* 984 F.2d 1053 (9th Cir.1993).

**5.** ˙ The agents in *Karo* were following the ether because they had learned that it was to be used to extract cocaine from clothing which had been imported to the United States.

activities within the house which they could not otherwise have learned without obtaining a warrant to search it." *People v. Deutsch,* 52 Cal.Rptr.2d at 369.

In rejecting the "canine sniff" cases as applicable to thermal imaging scans, the *Deutsch* court reasoned:

> Precisely because the thermal imager is indiscriminate in registering sources of heat it is an intrusive tool, which tells much about the activities inside the home which may be quite unrelated to any illicit activity. In this respect it is the very antithesis of a dog sniff because the trained narcotics dog alerts only in the presence of contraband, whereas the thermal imager indiscriminately registers all sources of heat.

*Id.* at 369 (citation omitted). Similarly, in *U.S. v. Field,* 855 F.Supp. 1518 (W.D.Wis. 1994), the court found that thermal imaging is more intrusive than a "canine sniff" for contraband. The court therein reasoned:

> Thermal imaging can extract information from within a person's home, the place most deserving of protection from government intrusion ... The imager can pick up heat sources of many kinds, including those not commonly thought of as such. To this extent the imager "intrudes" into the home, the place that has always enjoyed the highest level of protection in Fourth Amendment jurisprudence. A person can expect that his movements in a car may be tracked or that the suitcase he takes with him on a trip might be subject to inspection; he does not expect that his activities within his own home will be subject to high technology surveillance of the sort employed here. Unlike the dogs employed to sniff for contraband, the thermal imager picks up information of lawful activities as well as unlawful.

*Id.* at 1519. *See also State v. Young,* 123 Wash.2d 173, 867 P.2d 593, 598–99 (1994)("the infrared thermal detection investigation represents a particularly intrusive method of surveillance which reveals information not otherwise lawfully obtained about what is going on within the home").

Relevant decisions of the United States Supreme Court concerned with police surveillance methods are useful in discerning the reasonableness of warrantless thermal imaging scans. In *Dow Chemical Co. v. United States, supra,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), officials of the Environmental Protection Agency flew over Dow's manufacturing facility at altitudes of 12,000, 3,000, and 1,200 feet. The officials employed a commercial aerial photographer who used a "precision aerial mapping camera" to take photographs of the facility at those altitudes. *Id.* at 229, 106 S.Ct. at 1822, 90 L.Ed.2d at 232. The Supreme Court held that the search did not violate the Fourth Amendment. The court found that the curtilage doctrine did not apply to the open areas of this industrial facility, and that the photographs taken "were not so revealing of intimate detail as to raise constitutional concerns." *Id.* at 238, 106 S.Ct. at 1827, 90 L.Ed.2d at 236–38. The court in *Dow* found the photographs limited to "an outline of the facility's buildings and equipment," and not revealing of anything more "intimate." *Id.* at 238–39, 106 S.Ct. at 1827, 90 L.Ed.2d at 237–38.

The warrantless search found acceptable in *Dow Chemical* is distinguishable from a thermal imaging scan of a person's home in that a thermal scan looks into the curtilage of the home. With a thermal imager, the police actually scan the walls of a person's home. In addition, a thermal imager makes visible to the human eye what would not be visible without it. The thermal device makes visible not just the outline of a structure, but the location of "hot spots" within it. Thus, a thermal scan is more revealing of "intimate details" than were the aerial photographs in *Dow.*

In *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the United States Supreme Court addressed a police flyover of defendant's backyard at an altitude of 1000 feet (within navigable airspace). From this vantage point, the officers identified marijuana plants eight to ten feet high growing in the backyard, and photographed them with a standard 35 mm camera.

The Supreme Court found that this search did not violate the Fourth Amendment. The court held that although the police looked into the protected curtilage area of the home, the Fourth Amendment does not require the

police "to shield their eyes when passing by a home on public thoroughfares." *Id.* at 213, 106 S.Ct. at 1812, 90 L.Ed.2d at 216. "Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities *clearly visible.*" *Id.* (emphasis added). The *Ciraolo* court concluded that since the officers were able to "observe plants readily discernible to the naked eye as marijuana," the search was not an unreasonable one under the Fourth Amendment. *Id.* at 213, 106 S.Ct. at 1812, 90 L.Ed.2d at 217. Similarly, in *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the court found permissible under the Fourth Amendment a helicopter fly-over during which the police observed, with naked-eye surveillance, marijuana growing in a greenhouse within the curtilage of defendant's home.

The police searches in *Ciraolo* and *Riley* entered into the curtilage of the defendants' homes, but the police conducted those searches with "naked eye" surveillance. In contrast, in a thermal imaging scan, the search enters the curtilage of the home not with the naked eye, but with a surveillance device that makes visible what otherwise could not be seen. The search gives the police information about activities in the suspect's home, i.e., that he is engaged in some type of activity therein which involves more heat production than normally is generated inside a home. The search does not tell the police whether the activity occurring inside the home is legal or illegal.

Relevant decisions of the Pennsylvania Supreme and Superior Courts are also instructive on the issue of the reasonableness of thermal imaging searches. In *Commonwealth v. Oglialoro, supra,* 525 Pa. 250, 579 A.2d 1288, the police flew over appellee's barn in a helicopter. The roof of the barn consisted of transparent plastic sheets. The police, by naked eye surveillance, observed marijuana growing in the barn. *Id.* at 254, 579 A.2d at 1289–91. The Pennsylvania Supreme Court likened this situation to one

where a person leaves his windows open and uncovered so that any passerby might peer into one's dwelling. *Id.* at 256–57, 579 A.2d at 1291.

Although the barn was within the curtilage of the home, the *Oglialoro* court found that "[a]s long as the police have the right to be where they are, and the activity is clear and visible, the fact they are peering into curtilage is of no significance." *Id.* at 259, 579 A.2d at 1292. The court found that the search did not violate the Fourth Amendment on this basis.[6] A thermal imaging search differs from the type of search conducted in *Oglialoro* as thermal imaging scans are not done with the naked eye and the object of the search is not "clear and visible." *Id.* at 259, 579 A.2d at 1292.

In a very pertinent case, the Superior Court addressed the legality of police surveillance of a greenhouse connected to appellant's home. *Commonwealth v. Lemanski,* 365 Pa.Super. 332, 529 A.2d 1085 (1987). In *Lemanski,* a police officer stopped on a public road adjacent to appellant's residence and observed plants growing through the greenhouse roof. Due to the distance involved, the officer could not identify the plants. Later, that officer and another returned to the road, and using binoculars and a zoom lens, scanned the greenhouse and identified the plants as marijuana. *Id.* at 337, 529 A.2d at 1087. The trial court refused to suppress the evidence.

On appeal, the Superior Court held that the greenhouse was within the curtilage of the home and was thus entitled to protection under the Fourth Amendment. The court found that the police were not able to view the greenhouse without finding an opening in the shrubbery and brush along the property line of the house, and had to use "much more than [the] naked eye" to view the contents of the greenhouse. *Id.* at 349–50, 529 A.2d at 1093. Thus, the court found that the officer's observations could not form the basis for the issuance of a search warrant. *Id.* at 350, 529 A.2d at 1094.

**6.** However, the *Oglialoro* court also determined that the helicopter's presence at only fifty feet over the barn, although lawful, represented a "hazard" to persons and property on the ground.

*Id.* at 262, 579 A.2d at 1294. On this basis, the search was found to be intrusive and unreasonable. *Id.*

The result in *Lemanski* entirely supports a conclusion that the warrantless thermal imaging scan conducted here violated the Fourth Amendment. The police in *Lemanski*, as here, could not view the contraband with naked eye observation from their lawful vantage point. Thus, the search, which utilized binoculars and a zoom lens to make visible what the naked eye could not see, was found too intrusive to satisfy the Fourth Amendment's prohibition on unreasonable searches. Similarly, here, the police could not view the contraband they sought with naked eye surveillance from a lawful vantage point. Rather, the thermal imaging device, like the binoculars and zoom lens used in *Lemanski*, allowed the police to see what they otherwise could not.

The Commonwealth relies on *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987) in support of its argument that the Fourth Amendment does not prohibit the instant thermal imaging search. *Johnston* involved a canine-sniff search of a rental locker at a "Rent–a–Space" facility. The dog "alerted" at a locker belonging to defendant/appellant, where marijuana was subsequently found. The court concluded that the canine-sniff search did not violate the Fourth Amendment because the search was nonintrusive, the disclosure of information as a result of the search was extremely limited, the embarrassment and inconvenience of the search was minimal, and the items sniffed were located close to a public area (hallway). *Id.* at 462, 530 A.2d at 78.

Based on the reasoning of the *Deutsch* and *Field* cases, we find the "dog sniff" analogy unpersuasive in relation to thermal imaging. It is also clear that the *Johnston* case did not involve an intrusion into the curtilage of the home, as was the case with the thermal imaging scan here.

In the instant case, the police intruded into the protected curtilage of appellant's home when Captain Davis scanned the exterior walls of appellant's residence using the WASP device. The thermal imager made visible "hot spots" or "heat signatures," which were impossible to detect with the naked eye.

Although a thermal imager cannot detect "images" inside the walls of a home, the results of such a search do provide information about activities occurring inside the home, or items which may be contained therein. Thus, although a thermal imager does not penetrate the walls of a home, it nevertheless extracts from the outer walls information about occurrences within, which otherwise could not be obtained without a search warrant. *See United States v. Karo, supra.*

Like the *Deutsch* and *Field* courts, we do not find the "heat waste" analogy persuasive. As Captain Davis indicated in his testimony at the suppression hearing, the WASP device detects "heat signatures" on the walls of buildings. The thermal imager does not detect heat "vapors" escaping from a building so much as it looks at the walls of a structure to see if certain parts of it are "hotter" than other parts, or "hotter" than the walls of similar structures.

It is reasonable for individuals to expect that the police will not "read" the exterior walls of their homes with surveillance devices, searching for evidence of criminal activity. As the court stated in *Field*, "[a] person does not expect that his actions within his own home will be subject to high technology surveillance...." *United States v. Field*, 855 F.Supp. at 1519. Similarly, the *Deutsch* court recognized that "nondisclosed activities within the home are those in which society accepts a reasonable expectation of privacy and therefore [are] activities which require a warrant for government intrusion." *People v. Deutsch*, 52 Cal.Rptr.2d at 368.

The record here shows that appellant exhibited an actual expectation of privacy in the activities occurring in his home. He took extreme care to conceal the area of his home in which he was growing the marijuana from the view even of persons within the home. Thus, both parts of the *Katz* test for an unreasonable search under the Fourth Amendment—*i.e.*, (1) a person has exhibited an actual expectation of privacy, and (2) the expectation is one that society is prepared to accept as reasonable—are met under the facts of this case. *See Katz v. United States, supra*, 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588 (Harlan, J., concurring).

We find it necessary to rule in this manner to maintain the constitutional protections to our citizens which continue to have vitality and importance despite the advance of technology in police surveillance. As the Pennsylvania Supreme Court has stated:.

> To maintain freedom for all we must maintain an ordered society, which requires that we effectively enforce our laws. Thus, the strictures that are to be applied to preserve our freedom must never be allowed inadvertently to provide the vehicle for undermining it. Of equal concern is that we guard against surrendering in fear, in a perceived lawless era, fundamental protections that are essential to the preservation and maintenance of our free society.

*Commonwealth v. Miller*, 513 Pa. 118, 127–28, 518 A.2d 1187, 1192 (1986). We emphasize that the thermal imaging scan herein was conducted without a warrant. The results of the scan were used, in fact, to obtain a search warrant for the premises. For these reasons, we conclude that the use of the WASP device in the instant case violated the Fourth Amendment. Accordingly, that portion of the search warrant affidavit which relied on the information obtained as a result of the WASP scan was invalid and not a proper basis for issuance of the warrant.

██ Because we have found the thermal imaging search was violative of the Fourth Amendment, it is not necessary for us to specifically address appellant's contention that the search violated the Pennsylvania Constitution. However, it is well-established that the Pennsylvania Constitution has been held to provide *greater* privacy protection than the Fourth Amendment. *In the Interest of B.C.*, 453 Pa.Super. 294, 683 A.2d 919 (1996); *Commonwealth v. Gayle*, 449 Pa.Super. 247, 255 n. 9, 673 A.2d 927, 931 n. 9 (1996); *Commonwealth v. Wright*, 448 Pa.Super. 621, 627 n. 5, 672 A.2d 826, 829 n. 5 (1996).

Next, we must determine whether the information which was provided to the magistrate, other than that obtained as a result of the thermal imaging scan, was sufficient to support the issuance of the search warrant. *See Commonwealth v. Lemanski*, 365 Pa.Super. at 352, 529 A.2d at 1094 (when information obtained by unconstitutional search is determined to be an invalid basis for issuance of warrant, the question becomes whether the untainted information in the affidavit establishes probable cause for a search warrant). If the information provided by the WASP scan is omitted, the affidavit of probable cause in the instant case consisted of Officer Pfadt's attestations that he has been a police officer for nine years, a member of the Erie County Drug Task Force for five years, has investigated numerous violations of the Drug Act, is familiar with the methods used by individuals who sell and use controlled substances in violation of the law, and has been involved in numerous investigations involving the growing of controlled substances such as marijuana in an indoor environment. The affidavit then provided:

> During February 1994 an individual, whose identity is known to this officer, and will be referred to herein after as CI # 1, told this officer that he/she observed marijuana plants growing in the residence of Gregory Gindlesperger located at 807 Eldred St., Harborcreek Twp., Erie, Pennsylvania. CI # 1 stated that he/she is familiar with the appearance of a growing marijuana plant and the description of the marijuana plants given to this officer by CI # 1 is consistent with the appearance of marijuana plants known to this officer. CI # 1 stated that the plants are located in the basement area of the residence and consist of approximately eight adult plants and thirty clone plants.
>
> During the week of February 13, 1994 this officer instructed CI # 1 to confirm the marijuana plants were still being grown in the residence of Gindlesperger. The CI # 1 later contacted this officer and stated the marijuana was still being grown within the residence.
>
> During March 1994 CI # 1 stated that Gindlesperger has artific[i]al lighting set up to assist in the growing process of the marijuana plants.
>
> Within the last seventy-two hours CI # 1 again observed the growing marijuana plants in the residence of Gindlesperger. Individuals who grow marijuana in an indoor setting do so in a continuing operation and have plants in various stages of

growth so as to be able to have a continuous supply of marijuana to be harvested. This is based on this officer's experience and training.

CI # 1 has provided information to this officer in the past that has been proven reliable and will result in the arrests of individuals for violations of the drug laws.

Search Warrant and affidavit, April 9, 1994 (emphasis added).

 Appellant contends that the affidavit failed to establish that the confidential informant was reliable, and that his/her information was credible. Thus, he contends that the information in the affidavit attributable to the informant was not sufficient to establish probable cause for issuance of the search warrant. "A tip from an unnamed informant can properly form the basis for probable cause to issue a search warrant, provided there is adequate evidence of the informant's reliability." Commonwealth v. Lemanski, 365 Pa.Super. at 353, 529 A.2d at 1095. "[T]he reliability of the informant's information must be determined from the facts supplied by the police official." Id. A magistrate must consider four factors in determining the credibility of an unidentified informant and the reliability of his information:

(1) Did the informant give prior reliable information? (2) Was the informant's story corroborated by another source? (3) Were the informant's statements a declaration against interest? (4) Does the defendant's reputation support the informant's tip?

Commonwealth v. Gray, 322 Pa.Super. 37, 47, 469 A.2d 169, 174 (1983). It is not necessary that the affidavit satisfy all four of these criteria. Id.

In the instant case, the informant's statements were not a declaration against interest, nor was there any information concerning appellant's reputation that would support the informant's tip. We have held that the corroborating information, i.e., was obtained by an illegal search. Thus, the only criterion remaining to establish the confidential informant's reliability is whether he had given prior reliable information.

 The affidavit here indicated that the confidential informant had "provided infor-

mation to this officer in the past that has been proven reliable and will result in the arrests of individuals for violations of the drug laws." The reliability of the informant depended on this statement in the affidavit.

Appellant argues that this statement was insufficient to establish the informant's reliability. In Commonwealth v. Jones, 542 Pa. 418, 668 A.2d 114 (1995), the Pennsylvania Supreme Court addressed the issue of the reliability of a confidential informant. In that case, the police officer/affiant stated in the affidavit of probable cause that the confidential informant

has been reliable in the past with the arrest and conviction of the following people: J. Snoe on 7–18–92 for poss of Crack Cocaine, who received two years probation from Judge Little. L. Cargile on 7–23–92 for poss of Marij, who case is still pending in the Courts of Allegheny County. J. Newsome on 7–30–92 for poss with intent to Del Crack Cocaine, who case is still pending in the Courts of Allegheny County.

Id. at 423, 668 A.2d at 116. The Jones court found these assertions to be sufficient to establish the informant's reliability without additional corroboration. The court reasoned:

[T]he magistrate was presented with an affidavit containing information from an informant who was known to police and had provided reliable information in the past. The affidavit specifically states that the informant had provided tips on three prior occasions, resulting in one conviction and two cases pending before the courts. Furthermore, the affidavit provides the names of the prior arrestees and the dates they were arrested.

Id. at 426, 668 A.2d at 117.

In the instant case, the police officer/affiant stated that the informant had provided reliable information in the past. However, unlike Jones, the informant's information, as of the date of the affidavit, had not resulted in the arrest or conviction of other persons. At most, the affidavit indicated that arrests would occur at some unspecified time in the future. Further, the affidavit in the instant case, unlike the one in Jones, provided no

names or other details as to the arrests which were to take place.

 The fact that an affidavit does not contain the names, dates, or other information concerning prior arrests or convictions is not necessarily fatal to a determination that a confidential informant gave reliable information. *See Commonwealth v. Miller, supra*, 513 Pa. 118, 518 A.2d 1187 (Commonwealth not required to disclose names of persons anonymously referred to in affidavit as having been previously arrested on the basis of informant's tip, where such disclosure would lead to identification of confidential informant and informant would then be in danger). However, in the instant case, the affidavit not only lacked this specific information, it also stated that the informant's prior information "will lead" to arrests, rather than stating the customary "has in the past resulted in" arrests or convictions.

We have reviewed numerous cases in which the reliability of a confidential informant has been sustained on the basis that he has given prior reliable information. In none of those cases was there an allegation that the informant's information "will lead" in the future to arrests or convictions. *E.g., Commonwealth v. Jones, supra; Commonwealth v. Rodriguez*, 526 Pa. 268, 585 A.2d 988 (1991); *Commonwealth v. Dosch*, 348 Pa.Super. 103, 501 A.2d 667 (1985); *Commonwealth v. Healey*, 331 Pa.Super. 199, 480 A.2d 313 (1984); *Commonwealth v. Prosdocimo*, 308 Pa.Super. 187, 454 A.2d 84 (1982).

 "[T]he reliability of the informant's information must be determined from the facts supplied by the police official." *Commonwealth v. Lemanski*, 365 Pa.Super. at 353, 529 A.2d at 1095. The duty of a court reviewing the issuance of a search warrant is "to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Commonwealth v. Gray, supra*, 509 Pa. at 484, 503 A.2d at 925. Here, the "facts supplied by the police official" were lacking in detail as to the prior information provided by the confidential informant. In addition, the affiant did not assert that the prior tips had in fact resulted in arrest(s) or conviction(s). With both of these deficiencies, the reliability of the confidential informant was not established by the affidavit, even under a totality of the circumstances test.[7]

We conclude that the information in the affidavit which was provided by the confidential informant, did not establish probable cause for issuance of the search warrant. Thus, the search warrant was not supported by probable cause. The lower court therefore erred in failing to suppress the results of the search. Accordingly, we must vacate the judgment of sentence which was based on the evidence improperly seized herein.

Appellant's next contention on appeal is that the trial court erred in failing to require the Commonwealth to disclose the identity of the confidential informant. Given our ruling that the trial court erred in denying appellant's motion to suppress, it is not necessary for us to address this issue.

Appellant next argues that the trial court erred in "rejecting" his defense of medical necessity. Appellant contends that his sole purpose for growing and using the marijuana seized herein was for the treatment of his deafness, tinnitus, and excruciating headaches. Appellant asserts that the trial court should have accepted this defense at trial and at sentencing.

The trial judge in the instant case sat as the fact-finder, as appellant was tried in a non-jury trial. Appellant presented his defense of medical necessity at trial, in a short direct examination conducted by defense counsel. No objection was made to this testimony. At the close of testimony, the trial court permitted the parties to make closing statements. Counsel for appellant did not raise the issue of medical necessity in his closing argument to the court. Nor did appellant file post-trial motions, in which he could have raised the defense.

At sentencing, appellant did raise the issue of medical necessity in relation to the sentence to be imposed. Appellant argued that sentencing him to a period of incarceration, where he grew and used the marijuana for his medical needs, violates his constitutional rights under Article I, Sections 1, 2, and 26 of the Pennsylvania Constitution and under

7. *See Commonwealth v. Gray, supra*, 509 Pa. at 484, 503 A.2d at 925.

the Fifth and Fourteenth Amendments of the United States Constitution. Appellant asserts that his right to have access to the use of marijuana as a medical treatment to alleviate his suffering is an "important" right, which requires a heightened standard of review in evaluating the constitutionality of the sentencing statute, 18 Pa.C.S.A. § 7508(a)(1).

In a similar vein, appellant argues that 35 P.S. § 780–113(f)(2), which classifies the manufacture of marijuana as a felony, even if solely for personal use, and sets forth a maximum penalty of five years, is unconstitutionally overbroad. Appellant argues that the statutory scheme is unfair because it treats all manufacturing of marijuana the same, regardless of its purpose or the amount manufactured. In addition, appellant argues that the evidence was not sufficient to prove that he possessed twenty-one live marijuana plants; thus, he was improperly sentenced under section 7508(a)(1)(ii), which imposes a mandatory three year prison sentence where there are at least twenty-one (21) but less than fifty-one (51) live plants.

The lower court denied all of appellant's arguments concerning sentencing, without benefit of an opinion, but relying on *Commonwealth v. Burnsworth*, 543 Pa. 18, 669 A.2d 883 (1995). In *Burnsworth*, the defendant pled guilty to manufacture of marijuana and possession with intent to deliver marijuana, but contested the mandatory minimum sentencing provisions as to the number of plants confiscated. The Pennsylvania Supreme Court ruled that the language of section 7508(a)(1) is clear and unambiguous, and that under that language, the term "plant" should be construed according to its common usage. The court noted that the legislature enacted the statute to deter drug trafficking, and to deter the growing of marijuana. Further, the court held that "the legislative classification treating growers of marijuana differently from individuals who possess certain quantities of marijuana, must be evaluated under the 'rational basis' analysis." *Id.* at 29, 669 A.2d at 889. The court found that the rational basis test was met, in that "increased penalties for violations involving actual marijuana plants was enacted to discourage or, in fact, deter the production, or growth, or marijuana." *Id.* at 30, 669 A.2d at 889.

■ While the *Burnsworth* case does not address the medical necessity issue in relation to sentencing, it does address the issue of the constitutionality of the statute in terms of its classification "treating growers of marijuana differently" from possessors thereof, as well as the issue of what constitutes a marijuana "plant" for purposes of the statute. We decline to further analyze appellant's arguments related to his sentence, however, because we are vacating the judgment of sentence based on our ruling that the lower court should have suppressed the evidence seized herein. As any conclusions we would make on appellant's sentencing issues would therefore constitute mere dicta, it is not appropriate at this time to engage in a substantive constitutional analysis of the sentencing statutes in light of appellant's medical necessity issue. Such an analysis would be more appropriate in a case in which the lower court's determination of guilt is upheld. In such a case, the issue of medical necessity as related to sentencing could be properly addressed.

Judgment of sentence vacated; denial of motion to suppress is reversed; jurisdiction relinquished.

BROSKY, J., files a dissenting opinion.

BROSKY, Judge, dissenting.

The Fourth Amendment to the United States Constitution protects the citizens of the United States from unreasonable searches and seizures. By implication then, citizens are not free from government intrusion of all kinds, merely, unreasonable intrusion. If there were Paradise on earth, a kind of Nirvana, there would be no government intrusion of any kind. Indeed, in such a world there may not be a need for government at all. On the earth we know governments exist to provide for the people of the land. Laws exist in an effort to provide order and prevent chaos and to protect the innocent from those who would do evil. Thus, there is a need for law enforcement authorities and law enforcement activities.

In constitutional law regarding search and seizure, unreasonableness is often closely tied to intrusiveness. The more intrusive the action of law enforcement agents the more unreasonable the action is deemed to be. Of course, intrusive action by law enforcement is not illegal if preceded by the issuance of a warrant ensuring the justification of the action. Since in the present case the police did not secure a warrant prior to conducting the heat radiation testing the fundamental question before us is whether or not such testing is intrusive enough to require the issuance of a warrant before being conducted. In my opinion it is not.

Technological advances are creating difficult questions regarding surveillance of criminal suspects. Electronic eavesdropping is possible and now, particularly if some of Hollywood's movie offerings are representative, it is possible to "see" through walls in various ways to determine what a building's occupants are doing inside. Nevertheless, in my opinion, the conducting of the thermal detection test in the present case did not constitute a significant intrusion of appellant's privacy. The test was conducted from outside the residence, it did not disturb appellant's peace in any way and it revealed only minimal and generalized information which, by itself, was not of a sensitive nature. In my opinion the minimal invasion the test constitutes is outweighed by the public interest in effective law enforcement.

The majority provides an extensive analysis of fourth amendment law in an effort to persuade readers that the conducting of the thermal detection tests violated the fourth amendment. However, no cases in this Commonwealth have held so as yet. Thus, the initial determination of this issue lies with this panel. On one end of the fourth amendment spectrum entries into homes or wiretapping cannot be conducted without the issuance of a warrant. On the other end of the spectrum, a "flyover" of someone's property to observe what is going on below or the usage of trained dogs to sniff for drugs outside a rental space has passed constitutional scrutiny.[1] In my opinion, the intrusiveness of the thermal detection testing is more simi-

lar to the latter examples. Consequently, I would be inclined to find that the search did not violate appellant's rights under either the United States or Pennsylvania Constitution.

---

1. See, *Commonwealth v. Oglialoro*, 525 Pa. 250, 579 A.2d 1288 (1990), and *Commonwealth v.* *Johnston*, 515 Pa. 454, 530 A.2d 74 (1987).