[No. A066545. First Dist., Div. Four. Apr. 24, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DORIAN ODETTE DEUTSCH, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 3.

## COUNSEL

Katherine Alfieri, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

POCHÉ, J.—This case presents the question of whether a warrantless scan made with a thermal imaging device of a private dwelling constitutes an unreasonable search within the meaning of the Fourth Amendment to the United States Constitution. We hold that it does.

Defendant, Dorian Deutsch, pleaded no contest to a single count of furnishing a room in a building for the cultivation of marijuana (Health & Saf. Code, § 11366.5). On appeal she contends that the trial court erred in denying her motion to suppress evidence which was seized in a search made with a warrant issued in part upon the basis of the thermal imager scan of her home. (Pen. Code, § 1538.5.) That evidence included some 200 cannabis plants which were being cultivated hydroponically under high wattage lights in 2 walled-off portions of the home's garage.

According to the police officer's affidavit offered in support of the search warrant a confidential informant gave a friend a ride to defendant's home. When they arrived defendant gave the informant a small amount of dried marijuana as a thank you. The informant did not report seeing any growing cannabis plants inside the home, but did note that two doors in the living room were "blocked off with bedsheets." The officer obtained a search warrant for utility records which showed "an unusually high electrical usage" which he concluded was "extremely consistent with the indoor cultivation of cannabis." Some four days later, without having obtained a warrant the officer drove by the residence at 1:30 in the morning and scanned it with a thermal imager.

As described in the officer's affidavit a thermal imaging device is "a passive, nonintrusive system which detects differences in temperature at surface levels." Such devices measure radiant energy in the thermal portion of the electromagnetic spectrum[1] and display their readings showing areas which are relatively cold as nearly black, warmer areas in shades of gray and hot areas as white. (*U.S. v. Porco* (D.Wyo. 1994) 842 F.Supp. 1393, 1396.) With the imager the officer "observed high heat level readings, showing excessive heat release" from the "west side, north face, of the residence, which appeared to be the garage area."

### Discussion

### 1. Thermal Imaging

■ The warrantless use of thermal imaging devices has generated a considerable body of legal authority the bulk of which has sanctioned their use, concluding that their use is not an unreasonable search. A much smaller body of case law has rejected that view, and represents the better reasoned authority as applied to thermal imaging scans of private residences.

Defendant maintains that use of the thermal imager on her residence was a warrantless search conducted in violation of the right, under the Fourth Amendment to the United States Constitution "of the people to be secure in their persons, houses, papers and effects, against unreasonable searches . . . ." ■ In *Katz v. United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] the Supreme Court rejected the notion that every impermissible governmental intrusion must involve a physical invasion or trespass. (*Id.* at p. 353 [19 L.Ed.2d at p. 583].) Instead, it read the protections of the amendment to foreclose a warrantless electronic interception of telephone calls made from a glass enclosed public phone booth. (*Id.* at pp. 348, 352 [19 L.Ed.2d at pp. 580, 582].) As articulated in Justice Harlan's concurrence the appropriate test for Fourth Amendment purposes is twofold: first, the person must demonstrate an actual, subjective expectation of privacy in that which is searched and second, that expectation must be one our society recognizes to be reasonable. (*Id.* at p. 361 [19 L.Ed.2d at pp. 587-588] (conc. opn. of Harlan, J.).)

While Katz rejected strict categories of protected versus unprotected places, Justice Harlan noted the "home is, for most purposes, a place where

---

[1]The thermal imager differs from infrared devices (such as night vision goggles) in that the latter amplify the infrared spectrum of light whereas the thermal imager registers solely that portion of the infrared spectrum which we call heat. (Comment, *A High-Tech Assault on the 'Castle': Warrantless Thermal Surveillance of Private Residences and the Fourth Amendment* (1995) 90 Nw. U. L.Rev. 267, 280, fn. 100.)

[one] expects privacy, but objects, activities, or statements that [one] exposes" there to outsiders may fall outside the protection of the amendment because the householder has displayed them freely and has shown no intention to keep them private. (*Katz* v. *United States*, *supra*, 389 U.S. at p. 361 [19 L.Ed.2d at p. 588] (conc. opn. of Harlan, J.).) More recently the Supreme Court has restated the particular deference accorded the home characterizing as a basic "Fourth Amendment principle" the notion that "private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." (*United States* v. *Karo* (1984) 468 U.S. 705, 714 [82 L.Ed.2d 530, 541, 104 S.Ct. 3296].)

Information or activities which are exposed to public view cannot be characterized as something in which a person has a subjective expectation of privacy, nor can they fulfill the second prong of *Katz*—as being that which society reasonably expects will remain private. A common theme of public disclosure which defeats privacy runs through many cases in which no search was found to have occurred: such as a mechanically recorded list of phone numbers dialed kept by the phone company which has been held to be as publicly disclosed as if the calls had been made through an operator (*Smith* v. *Maryland* (1979) 442 U.S. 735, 743-744 [61 L.Ed.2d 220, 228-229, 99 S.Ct. 2577]), or high resolution photographs of structures in an industrial building complex viewed from the air which are as available to government inspection as to that of any airborne passerby. (*Dow Chemical Co.* v. *United States* (1986) 476 U.S. 227, 237, fn. 4, 239 [90 L.Ed.2d 226, 237, 238, 106 S.Ct. 1819].) Accordingly, a warrantless thermal scan of an outbuilding located some 200-300 yards from a home has been upheld because the structure was in an "open field." (*U.S.* v. *Ishmael* (5th Cir. 1995) 48 F.3d 850, 857.)

One who discards garbage by setting it out on the public street has renounced any expectation of privacy in the contents of his garbage bin. (*California* v. *Greenwood* (1988) 486 U.S. 35, 40 [100 L.Ed.2d 30, 36-37, 108 S.Ct. 1625].) Analogizing to the discarded garbage of *Greenwood* certain thermal imaging opinions have characterized the heat signatures registered by the device as "heat waste." (*U.S.* v. *Penny-Feeney* (D.Hawaii 1991) 773 F.Supp. 220, 225, affd. on other grounds in *U.S.* v. *Feeney* (9th Cir. 1993) 984 F.2d 1053, 1056; *U.S.* v. *Ford* (11th Cir. 1994) 34 F.3d 992, 995; *U.S.* v. *Myers* (7th Cir. 1995) 46 F.3d 668, 669.) The analogy is neither good law nor good physics. As a recent decision from the Tenth Circuit points out, the thermal imager does not simply measure the waste heat radiating from a structure, but it measures all temperature differentials

across the exterior surface of the structure. (*U.S.* v. *Cusumano* (10th Cir. 1995) 67 F.3d 1497, rehg. granted Dec. 15, 1995.) Therefore, the function of the device is to paint an infrared picture of the heat sources which permits inferences about the heat generating activities occurring within the residence. (*Id.* at p. 1501.) Moreover, as the *Cusumano* court notes, the thermal imager is no more directed to measuring waste heat than the electronic bug affixed to the phone booth in *Katz* was directed to collecting waste sound waves. (*Ibid.*)

The principle that nondisclosed activities within the home are those in which society accepts a reasonable expectation of privacy and therefore activities which require a warrant for government intrusion is clearly set out in two Supreme Court beeper cases. In *United States* v. *Karo, supra,* 468 U.S. 705, drug enforcement agents arranged for a beeper to be inserted in a can of ether the agents believed was being obtained for the purpose of extracting cocaine from drug-impregnated clothing. (*Id.* at p. 708 [82 L.Ed.2d at p. 537].) Using the signals from the beeper the agents located the can in the course of its movements to a private residence, to two different storage facilities, and then to a second residence. (*Id.* at pp. 708-709 [82 L.Ed.2d at pp. 537-538].) The court concluded that the monitoring of the beeper when it was inside a private residence was an unreasonable search because "[t]he beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched." (*Id.* at p. 715 [82 L.Ed.2d at p. 541].) While the court noted that the monitoring of the beeper was less intrusive than a full-scale search would be, nonetheless the beeper revealed information to the government which would not otherwise have been obtained without a search warrant. (*Ibid.*)

The outcome of *Karo* turned on the information conveyed to the monitoring agents by the beeper's signals while it was within the residence and therefore the case was distinguished by the court from its holding a year earlier in *United States* v. *Knotts* (1983) 460 U.S. 276 [75 L.Ed.2d 55, 103 S.Ct. 1081]. In *Knotts* a beeper was inserted into a drum of chloroform which authorities believed would be used for the manufacture of illicit drugs. However, in that case the beeper was monitored only on its journey over public roadways up to the time the drum was transferred into a private residence. (*Id.* at p. 278 [75 L.Ed.2d at pp. 59-60].) Reasoning that there was "no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin," the court upheld the monitoring of the beeper. (*Id.* at p. 285 [75 L.Ed.2d at p. 64].) Like the beeper signal being monitored inside the residence in *Karo* the thermal

imaging scan of defendant's residence told the police something about activities within the house which they could not otherwise have learned without obtaining a warrant to search it.

To suggest that a thermal scan passes constitutional muster because it is not intrusive becomes a circular argument. The People argue that the thermal scan does not reveal personal, intimate details about what occurs inside the home. Sometimes the argument is made that the imprecision of the scan reveals only heat signatures which lack sufficient clarity to paint images of exactly what inside the house is the source of the heat. In short, the scan cannot distinguish between a marijuana grow room and a hydroponic tomato farm. In fact in one reported case the only "hot spot" found by the thermal scan used to support a search warrant of the premises, turned out to be a "standard household dehumidifier" located in the residence, while in fact marijuana was being grown in an outbuilding. (*U.S.* v. *Field* (W.D.Wis. 1994) 855 F.Supp. 1518, 1523-1525.) Precisely because the thermal imager is indiscriminate in registering sources of heat it is an intrusive tool, which tells much about the activities inside the home which may be quite unrelated to any illicit activity. In this respect it is the very antithesis of a dog sniff because the trained narcotics dog alerts only in the presence of contraband (*United States* v. *Place* (1983) 462 U.S. 696, 707 [77 L.Ed.2d 110, 120-121, 103 S.Ct. 2637])[2] whereas the thermal imager indiscriminately registers all sources of heat.

Defendant demonstrated a subjective expectation of privacy in the activities she conducted inside her home. The grow rooms found in her garage were walled off, and the view by visitors into the rest of her house from the living room was blocked by bedsheets hung over the doorways. We find that society recognizes as reasonable an expectation that the heat generated from within a private residence may not be measured by the government without a warrant permitting such a search. In this instance the warrantless thermal scan of defendant's home was an unreasonable search prohibited by the Fourth Amendment.

---

[2]Dog sniff cases, those in which dogs specially trained to alert to the odor of certain types of contraband, have been characterized by our Supreme Court as sui generis. (*United States* v. *Place, supra,* 462 U.S. 696, 707 [77 L.Ed.2d 110, 120-121].) In *Place* a sniff of luggage conducted at an airport was upheld as not a search within the meaning of the Fourth Amendment. (*Ibid.*) Similarly a dog sniff of a warehouse conducted from an alley open to the public was upheld in *U.S.* v. *Lingenfelter* (9th Cir. 1993) 997 F.2d 632, and a sniff of a semitrailer parked by a gas station in an area open to the public was likewise allowed in *United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880. In *U.S.* v. *Colyer* (D.C. Cir. 1989) 878 F.2d 469 [278 App.D.C. 367] a dog sniff of a railway sleeping compartment made from the train corridor was upheld after the court concluded that although a sleeping car "may in some ways resemble a residence, it enjoys no such status in the law." (*Id.* at p. 476.)

## 2. *Sufficiency of the Affidavit*

Defendant maintains that without the results of the impermissible thermal scan made of her residence the affidavit providing a basis for issuance of the search warrant falls short of establishing probable cause. Probable cause is a "strong suspicion" that what is being sought will be in the location to be searched. (*Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 564 [128 Cal.Rptr. 641, 547 P.2d 417].) The magistrate who issues the warrant must conclude whether, given the totality of the circumstances set out in the affidavit, there is a fair probability that the evidence sought will be located at the scene of the search. (*Illinois* v. *Gates* (1983) 462 U.S. 213, 238-239 [76 L.Ed.2d 527, 548-549, 103 S.Ct. 2317].) On appeal we accord the magistrate's determination great deference, inquiring only whether there was a substantial basis to conclude that the warrant would uncover evidence of crime. (*Id.* at p. 236 [76 L.Ed.2d at pp. 546-547].)

The affidavit submitted by Detective Watkins recounted that the confidential informant was not only given a small amount of marijuana while inside the home, but also detected "a heavy odor of marijuana" there. The informant also noted that doorways in the living room area were blocked by bedsheets. In addition to the information from the informant, Detective Watkins obtained with a warrant records of the electrical consumption at the residence. Those records showed that electrical consumption was "up to seven times the baseline quantity rate" which in the opinion of the officer was "extremely consistent with the indoor cultivation of cannabis."

In his affidavit the officer recounted a considerable personal experience with narcotics investigations and arrests, including seven prior warrants for indoor growing of cannabis. The opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination. (*People* v. *Tuadles* (1992) 7 Cal.App.4th 1777, 1784 [9 Cal.Rptr.2d 780].) Given the totality of the information set out in the affidavit after excising the results of the thermal scan, we can say that there was a substantial basis to support a strong suspicion that there was evidence of a crime to be found in defendant's home.[3] The trial court did not err in denying the motion to suppress/motion to traverse the search warrant.

---

[3]In light of our conclusion in part 1 that the warrantless use of the scan was impermissible we need not reach defendant's additional contention that the results of that scan as conveyed in conclusory terms in the affidavit formed an inadequate factual basis for the magistrate's determination.

### 3. *Denial of Franks Hearing\**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### *Disposition*

Although we hold that the warrantless use of the thermal imager upon defendant's residence violates the Fourth Amendment, we nonetheless affirm because even without the results of the thermal scan the affidavit provides a substantial basis for the magistrate's finding of probable cause to search. (*Illinois* v. *Gates, supra,* 462 U.S. at p. 238 [76 L.Ed.2d at p. 548].)

The judgment of conviction is affirmed.

Reardon, J., concurred.

**ANDERSON, P. J.,** Concurring and Dissenting.—I concur with the result reached by my colleagues but respectfully disagree with their conclusion that the thermal scan of defendant's roof constituted an unreasonable search prohibited by the Fourth Amendment.

My colleagues acknowledge that the view they adopt is a minority view but assert that it is "better reasoned." It is not. To date, four circuit courts of appeal have reached the conclusion that warrantless thermal scans do not violate the Fourth Amendment. (*U.S.* v. *Ishmael* (5th Cir. 1995) 48 F.3d 850; *U.S.* v. *Pinson* (8th Cir. 1994) 24 F.3d 1056; *U.S.* v. *Myers* (7th Cir. 1995) 46 F.3d 668; *U.S.* v. *Ford* (11th Cir. 1994) 34 F.3d 992; and *U.S.* v. *Robinson* (11th Cir. 1995) 62 F.3d 1325.) Only one Circuit Court of Appeal has adopted the majority's view, and that circuit has agreed to reconsider its determination. (*U.S.* v. *Cusumano* (10th Cir. 1995) 67 F.3d 1497, rehg. granted Dec. 5, 1995.) The Tenth Circuit's choice to grant a rehearing in *Cusumano* leaves one federal trial court (*U.S.* v. *Field* (W.D.Wis. 1994) 855 F. Supp. 1518) and one state court (*State* v. *Young* (1994) 123 Wn.2d 173 [867 P.2d 593]) which have reached the same conclusion as the majority.[1]

The majority dismisses the thinking of the Fifth, Seventh, Eighth, and Eleventh Circuits by pointing out that one district court opinion (*U.S.* v. *Penny-Feeney* (D.Hawaii 1991) 773 F.Supp. 220, affd. on other grounds in

---

\*See footnote, *ante,* page 1224.

[1]The determination by the Washington Supreme Court that the use of a thermal imaging device violates the Fourth Amendment was dictum. The court first determined that thermal screening violates the Washington State Constitution. (*State* v. *Young, supra,* 867 P.2d at pp. 595-601.) The court only addressed the Fourth Amendment question "for the purpose of providing guidance to other courts . . . ." (*Id.* at p. 601.)

U.S. v. *Feeney* (9th Cir. 1993) 984 F.2d 1053) and two circuit courts of appeal opinions (*U.S.* v. *Ford, supra,* 34 F.3d 992 and *U.S.* v. *Myers, supra,* 46 F.3d 668) purportedly referred to the heat emanating from the homes in question as " 'heat waste' " and arguing that such a characterization is "neither good law nor good physics." The majority then argues, in essence, that heat "waste" emanating from a home is not analogous to "garbage can" cases (see *California* v. *Greenwood* (1987) 486 U.S. 35, 40 [100 L.Ed.2d 30, 36-37, 108 S.Ct. 1625]) in which it has been determined that persons placing their garbage on public streets renounce all expectation of privacy in the contents of their garbage bins.

The majority's dismissal of the *Penny-Feeney, Ford,* and *Myers* cases misses a key factual distinction between those cases and the one at bench. In the three noted cases, the thermal imaging devices discovered heat being intentionally discharged by marijuana growers through vents. Thus, in each of those cases, the analogy between the venting of heat (or heat waste) and the discarding of garbage was apropos. Put another way, in none of those cases could the defendants have subjectively or reasonably have had an expectation of privacy when they vented the excess heat from their growing operations into the atmosphere.

When the Eleventh Circuit confronted the identical situation we face in the case at bench—the use of a thermal scan to discern heat differentials where the defendant did not intentionally vent the heat into the atmosphere —the court adopted a different approach. (*U.S.* v. *Robinson, supra,* 62 F.3d at pp. 1328-1330.) In doing so, the Eleventh Circuit specifically addressed and distinguished its earlier decision in *U.S.* v. *Ford, supra,* 34 F.2d 992. It is the *Robinson* analysis which I believe properly addresses the Fourth Amendment issue in the case at bench, an analysis that deserves serious consideration:

"The Fourth Amendment provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' U.S. Const. amend. IV. In *United States* v. *Ford,* 34 F.3d 992 (11th Cir.1994), we held that the ground surveillance of an unoccupied mobile home on leased land with a thermal infrared heat detector did not violate the Fourth Amendment. Three other circuits also have concluded that thermal infrared surveillance or FLIR [Forward Looking Infrared Receiver] is not an unconstitutional search. *United States* v. *Ishmael,* 48 F.3d 850 (5th Cir.1995); *United States* v. *Myers,* 46 F.3d 668 (7th Cir.1995); *United States* v. *Pinson,* 24 F.3d 1056 (8th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994). Robinson argues that this case is distinguished from *Ford* because it involves an

occupied home, which specifically implicates the Fourth Amendment. As we explain, our *Ford* analysis also applies to the aerial FLIR surveillance of Robinson's home.

"In *Ford*, we recognized that a party alleging an unconstitutional search under the Fourth Amendment must establish *both* a subjective *and* an objective expectation of privacy to succeed. *Ford*, 34 F.3d at 995 (citing *Katz v. United States*, 389 U.S. 347, 361 . . . (1967) (Harlan, J., concurring)). The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that ' "the [privacy] expectation be one that society is prepared to recognize as 'reasonable.' " ' [Citation.] Thus, we must determine whether Robinson had a subjective expectation of privacy that society would recognize as objectively reasonable.

"Our conclusion in *Ford* that the defendant-appellant held no subjective expectation of privacy turned on his purposefully venting the heat from his marijuana cultivation inside the mobile home with an electric blower through holes drilled in the floor. [Citation.] In contrast to *Ford*, Robinson did not vent the heat from his marijuana growing operation or deliberately assist the emission of heat in *any way*. Consequently, we must decide in this case whether inaction can be as revealing regarding the subjective expectation of privacy as action.

"The focal issue is whether Robinson had a subjective expectation of privacy in the *heat* generated by his indoor marijuana cultivation. We find none. While Robinson attempted to conceal his marijuana growing operation by conducting it inside his home, the record does not indicate that he affirmatively took any action to prevent the resulting heat from being emitted into the atmosphere above his house. The record shows no consideration for the emitted heat whatsoever until his indictment and knowledge of the FLIR surveillance, which measured *solely heat* expelled into the atmosphere from Robinson's home. Robinson's *inaction* regarding the heat generated from his marijuana cultivation demonstrates his lack of concern for it. Thus, we conclude that Robinson has not established a subjective expectation of privacy in this heat emitted from his home.

"Even if Robinson had demonstrated a subjective expectation of privacy in the heat emitted from his home, he also would have to establish the objective component of the *Katz* two-part test. Under the objective prong, the proper inquiry is whether the ' "government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." ' [Citation.] Therefore, Robinson would have to demonstrate that his privacy

expectation in the heat rising from his house would be accepted by society as objectively reasonable.

"In validating the visual inspection of a greenhouse where marijuana was being cultivated within the curtilage of a house, the Supreme Court found that 'no *intimate details* connected with the use of the home or curtilage were observed' during the aerial viewing. *Florida v. Riley*, 488 U.S. 445, 452 . . . (1989) (emphasis added). FLIR surveillance cannot measure temperature; it 'merely compare[s] the amount of heat radiated from various objects.' *Pinson*, 24 F.3d at 1057. '[T]he mere fact that the police have employed relatively sophisticated forms of technological surveillance does not render the surveillance unconstitutional. . . . The crucial inquiry, as in any search and seizure analysis, is whether the technology reveals "intimate details." ' *Ishmael*, 48 F.3d at 855-56 (footnote omitted) (citation omitted) (quoting *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 . . . (1986)); *accord Ford*, 34 F.3d at 996; *Pinson*, 24 F.3d at 1059.

"In this case, the FLIR surveillance revealed only that Robinson's house emitted significantly more heat than others in the neighborhood of similar size. No revelation of intimate, even definitive, detail within the house was detectable; there was merely a gross, nondiscrete bright image indicating the heat emitted from the residence. Such heat detection with thermal imagery is not the 'functional equivalent of an X-ray machine in that it allows officers to "see" within a structure what it otherwise cannot see with the naked eye.' *Ishmael*, 48 F.3d at 856.

"Moreover, there was no intrusion whatsoever into Robinson's home because the emitted heat rose from his house and then was measured by the FLIR surveillance. See [*U.S. v. Ishmael, supra,* 48 F.3d at p. 856] (holding that the '*manner*' of detecting heat is 'significant in assessing the reasonableness of the intrusion'). Using infrared surveillance to ascertain heat intensity is analogous to the warrantless use of drug-detecting dogs to locate contraband. [Citation.] Validating FLIR surveillance of a home, the Eight[h] Circuit found that '[j]ust as odor escapes a compartment or building and is detected by the sense-enhancing instrument of a canine sniff, so also does heat escape a home and is detected by the sense-enhancing infrared camera.' *Pinson*, 24 F.3d at 1058. Because considerable electric lighting resulting in uncommon heat output is associated with indoor marijuana cultivation, unusual heat registered by FLIR surveillance serves as a method of identification.

"Thus, we conclude that '[n]one of the interests which form the basis for the need for protection of a residence, namely the intimacy, personal autonomy and privacy associated with a home, are threatened by [FLIR] thermal

imagery.' [*U.S.* v. *Pinson, supra,* 24 F.3d] at 1059; see *Myers,* 46 F.3d at 670 (determining that the thermal surveillance of a home was constitutional, the Seventh Circuit concluded that '[a] thermal imaging scan does not intrude in any way into the privacy and sanctity of a home'). Robinson has failed to establish an objective or reasonable expectation of privacy in the heat emitted from his house resulting from the unlawful marijuana cultivation inside, even if he had met the subjective component of the *Katz* test. Significantly, we are unconvinced that society ever would accept use of the Fourth Amendment to shield unlawful activity within one's home when there are noninvasive methods of detecting such criminal activity through legitimate byproducts, such as the heat at issue in this case. We hold that the FLIR surveillance of Robinson's home was not an unreasonable search violative of the Fourth Amendment." (*U.S.* v. *Robinson, supra,* 62 F.3d at pp. 1328-1330, fns. omitted, original italics.)

The only point discussed by the majority which is not disposed of by *Robinson* is the argument based on *United States* v. *Karo* (1984) 486 U.S. 705 [82 L.Ed.2d 530, 104 S.Ct. 3296] and *United States* v. *Knotts* (1983) 460 U.S. 276 [75 L.Ed.2d 55, 103 S.Ct. 1081]. The majority concludes that the lesson to be learned from *Karo* and *Knotts* is: "[l]ike the beeper signal being monitored inside the residence in *Karo* the thermal imaging scan of defendant's residence told the police something about activities within the house which they could not otherwise have learned without obtaining a warrant to search it." (Majority opn., *ante,* at pp. 1230-1231.) In my view, *Karo* and *Knotts support* the view that thermal imaging scans do not constitute improper searches under the Fourth Amendment. Unlike the beeper which was introduced into a private residence in *Karo,* a thermal imaging scan simply does not penetrate the inner sanctum of the home.

In sum, I respectfully believe that the Eleventh Circuit has it right, and the majority here does not.

A petition for a rehearing was denied May 23, 1996, and respondent's petition for review by the Supreme Court was denied July 24, 1996. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.